**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| CHERI GAINOR, |
| *Plaintiff*, |
| v. |
| OPTICAL SOCIETY OF AMERICA, INC., |
| *Defendant*. |

Civil Action No. 13-612 (RDM)

### MEMORANDUM OPINION AND ORDER

The plaintiff, Cheri Gainor, brings this action under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and the D.C. Minimum Wage Act, D.C. Code §§ 32-1001 *et seq.* ("DCMWA"), alleging that her former employer, the Optical Society of America, Inc. ("Optical Society"), violated federal and DC law by failing to pay her overtime compensation. The Optical Society, in turn, moves for summary judgment on the ground that Gainor was an exempt administrative employee and, accordingly, was not entitled to overtime compensation. The Optical Society further contends that, even if Gainor was not an exempt employee, it is entitled to partial summary judgment with respect to her claim for liquidated damages because it had a good-faith belief that she was an exempt employee. As the Court explains below, genuine issues of material fact preclude an award of summary judgment on either ground.

### I.  BACKGROUND

The Optical Society is a membership organization comprised of "more than 70,000 professionals from 134 countries" with a mission of "promot[ing] the science of light and the advanced technologies made possible by optics and photonics." Dkt. 11-3 at 3 (employee

handbook).[1]  Through its "publications, events, technical groups and programs," the Optical

Society "foster[s] optics knowledge and scientific collaboration among all those with an interest

in optics and photonics."  *Id.*

The Optical Society employed Gainor as one of two or three meetings managers in its

meetings department from January 18, 2012, to March 15, 2013.  Dkt. 14-2 at 1 (Pl.'s SUMF

¶ 5); Dkt. 14-4 at 39 (Gainor Dep. at 151–52); Dkt. 14-5 at 4 (Jackman Dep. at 9).  Gainor's

direct supervisor was Deputy Senior Director of Conventions and Meetings Britt Jackman, Dkt.

11-11 at 2 (Jackman Decl. ¶ 3), who in turn reported to Chad Stark, the Deputy Executive

Director, Chief Meetings Officer, Dkt. 14-5 at 4 (Jackman Dep. 9); Dkt. 14-6 at 3 (Stark Dep. 7).

Gainor often worked on teams with meeting coordinators and meeting planners—staff members

who she outranked and to whom she could delegate tasks—but she did not serve as their direct

supervisors, did not have authority to hire or fire anyone, and lacked authority to choose which

staff members worked on her projects.  Dkt. 14-4 at 35, 37 (Gainor Dep. 135–37, 145); Dkt. 14-5

at 4–5, 10, 12 (Jackman Dep. 12–13, 34–36, 42–43).[2]

As a meetings manager, Gainor was responsible for the logistical aspects of certain

Optical Society events, *see* Dkt. 11 at 31 (Def.'s SUMF ¶ 9); Dkt. 14-4 at 20 (Gainor Dep. 75–

76), but she was not involved in developing the substantive content of the events or in

determining what events would be held, *see* Dkt. 14-5 at 4–5, 14, 25 (Jackman Dep. 12–13, 50,

94); Dkt. 14-4 at 27 (Gainor Dep. 103–105); Dkt. 14-6 at 7–8, 12 (Stark Dep. 23–26, 42); Dkt.

---

[1]  Elsewhere in the record the Optical Society states that it is comprised of "18,500 individuals (including 5,000 students) and 250 businesses."  Dkt. 11-4 at 2.

[2]  The meetings department also employed a registration manager, who reported directly to Jackman.  It is unclear whether Gainor outranked the registration manager, with whom she worked "collaboratively."  *See* Dkt. 14-5 at 4, 13 (Jackman Dep. 9, 48).

14-2 at 3 (Pl.'s SUMF ¶ 15).  After an event was assigned to her by Jackman, Gainor researched and made recommendations with respect to event vendors such as hotels, restaurants, caterers, entertainers, and audiovisual-equipment suppliers.  *See* Dkt. 11 at 35 (Def.'s SUMF ¶ 29); *see also* Dkt. 11-26; Dkts. 11-29–11-34; Dkt. 11-39; Dkt. 11-42; Dkt. 11-43; Dkt. 11-51.  In the course of this process, Gainor sometimes negotiated with vendors to obtain a better price.  *See* Dkt. 11-26 at 2; Dkt. 11-29 at 2–4; Dkt. 11-30 at 3; Dkt. 11-32 at 2; Dkt. 11-34 at 3; Dkt. 11-43 at 2; Dkt. 14-4 at 55, 57–58, 60 (Gainor Dep. 215, 225–28, 234–35).  For some events, Gainor developed event budgets based on previous years' budgets that were then sent "up the chain" for approval by Jackman or Stark, then by the executive team, and, finally, by the Optical Society's board.  Dkt. 14-6 at 6–7 (Stark Dep. 13–18).  Once the budgets were approved, Gainor was responsible for ensuring a given event stayed within budget and then, post-event, for reviewing bills for accuracy and ensuring they were coded properly in accordance with the finance department's system.  Dkt. 14-6 at 10 (Stark Dep. 34–35).  Gainor was also responsible for myriad other logistical aspects of the events assigned to her, such as coordinating room set up, Dkt. 11-54 at 2; Dkt. 14-5 at 24 (Jackman Dep. 91–92), shipping materials to the event location, Dkt. 11-37 at 2, posting event information on the Optical Society's website, Dkt. 14-4 at 38 (Gainor Dep. 149), producing event signage and name tags, Dkt. 14-5 at 15 (Jackman Dep. 53–54), executing on-site registration, and providing on-site customer service to event participants, *see* Dkt. 14-5 at 13–14 (Jackman Dep. 48–49).  Broadly speaking, she generally served as a project manager for the logistical aspects of events assigned to her.  *See* Dkt. 14-5 at 12, 15 (Jackman Dep. 44, 56).

The Optical Society hosted several different kinds of events, and Gainor's responsibilities varied based on the type of event.  Gainor worked on at least two "congresses," which were

meetings focused on a particular topic in the optics industry that provided members with networking and informational opportunities, including plenary sessions, symposia, short courses, and exhibits.  *See* Dkt. 11 at 31 (Def.'s SUMF ¶ 12) (stating Gainor worked on two congresses); Dkt. 14-2 at 2 (Pl.'s SUMF ¶ 8) (stating Gainor worked on three congresses); *see also* Dkt. 11-15 at 2; Dkt. 14-4 at 27 (Gainor Dep. 104–105).  Gainor was not responsible for choosing the location for a congress, which was determined through a board-driven process that occurred two years in advance.  Dkt. 14-5 at 19–20, 29 (Jackman Dep. 71–73, 109); Dkt. 14-6 at 8 (Stark Dep. 26).  After the location for a congress was selected, Gainor was responsible for working with the designated hotel to review menus for food supplied by the hotel, and she coordinated other logistical matters.  Dkt. 14-5 at 20 (Jackman Dep. 74); Dkt. 14-6 at 7 (Stark Dep. 23–24).  The total cost of a congress ranged from $50,000 to $400,000, Dkt. 14-6 at 12 (Stark Dep. 41), and the budgets for congresses were subject to the usual chain-of-command procedure described above, Dkt. 14-6 at 7 (Stark Dep. 24).

Gainor also worked on several "governance" meetings and leadership conferences.  *See* Dkt. 11 at 31 (Def.'s SUMF ¶ 12) (stating Gainor worked on two "[g]overnance meetings," "Summer Strategy Week," and two seasonal leadership conferences); Dkt. 11-14 at 11 (stating Gainor worked on two leadership conferences); Dkt. 14-2 at 2 (Pl.'s SUMF ¶ 8) (stating Gainor worked on "three leadership events").[3]  Governance meetings and leadership conferences were meetings of top members of the Optical Society (including members of the board and other committees) at which the organization's policies, programming, and procedures were discussed and established.  *See* Dkt. 11 at 32 (Def.'s SUMF ¶¶ 15, 16); Dkt. 14-4 at 26 (Gainor Dep. 101).

---

[3]  It is undisputed that the 2012 Winter Leadership Conference had largely been planned before Gainor began work, and that she was, accordingly, not the lead meetings manager for that event. Dkt. 14-4 at 22, 25 (Gainor Dep. 82–85, 96); Dkt. 17 at 9.

For these events, Gainor was required to work closely with the Optical Society's executive office, to which she submitted recommendations as to appropriate venues and other vendors. Dkt. 11-18 at 3; Dkt. 14-5 at 17, 20–21 (Jackman Dep. 63–64, 76–78); Dkt. 14-6 at 12 (Stark Dep. 43–44).  The executive office provided itemized budgets to Gainor for these meetings, directing, for example, how much could be spent on catering.  *See* Dkt. 11-28 at 2; Dkt. 14-4 at 33–34 (Gainor Dep. 128–30); Dkt. 14-6 at 13–14 (Stark Dep 47–49).

Finally, Gainor also worked on several "incubator" meetings, which were "meeting[s] with limited participation of . . . 70 to 75" leaders from a designated field of optics held at the Optical Society's offices in Washington, D.C.  *See* Dkt. 11 at 31 (Def.'s SUMF ¶ 12) (stating that Gainor worked on four incubator meetings); Dkt. 14-2 at 2 (Pl.'s SUMF ¶ 8) (stating that Gainor worked on two incubator meetings); Dkt. 14-5 at 6 (Jackman Dep. 20).  Incubator meetings were led by a volunteer "host" from the professional community who invited the participants.  Dkt. 14-5 at 7 (Jackman Dep. 22).  At the conclusion of the meeting, the host would submit a whitepaper summarizing the participants' discussion of scientific ideas.  Dkt. 14-5 at 6 (Jackman Dep. 20); Dkt. 11-47 at 2.  For such meetings, the meeting manager was the "logistics overseer," while the director of business development worked on the program for the meeting.  Dkt. 14-5 at 7 (Jackman Dep. 21).  Gainor was responsible for tasks such as facilitating the production of a welcome letter from the host to participants, Dkt. 14-5 at 7 (Jackman Dep. 22–23), coordinating the receipt of the whitepaper from the host, Dkt. 11-45 at 2; Dkt. 11-47 at 2, providing restaurant recommendations for evening events, and general logistical project management, Dkt. 14-5 at 29, 32 (Jackman Dep. 112, 122).[4]  For incubator meetings, meeting

---

[4]  Gainor did not need to select a hotel for incubator meetings because the Optical Society would typically use the same hotel near its offices.  Dkt. 14-6 at 14 (Stark Dep. 51).

managers were provided "placeholder budgets," which were then modified as the event approached.  Dkt. 14-5 at 33–34 (Jackman Dep. 128–29).  For some of the incubator meetings, Jackman and Stark made the budget modifications, but for others Gainor made modifications to the budget that were then finalized by the director of development.  Dkt. 14-5 at 7, 33–34 (Jackman Dep. 21–22, 126–29).

The Optical Society terminated Gainor's employment in March 2013, citing performance issues.  *See* Dkt. 11 at 39 (Def's SUMF ¶ 41).  On April 30, 2013, Gainor filed this suit under FLSA and DCMWA, seeking to recover unpaid overtime wages, liquidated damages, attorney's fees, and costs.  *See* Dkt. 1 (Compl. ¶ 35).

## II.  LEGAL STANDARD

The Optical Society moves for summary judgment on Gainor's claims for overtime pay under FLSA and DCMWA, contending that the administrative-employee exemption applies and that, even if the exemption does not apply, Gainor is not entitled to liquidated damages because the Optical Society had a good-faith belief that the exemption applied.  *See* Dkt. 11.  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Liberty Lobby*, 477 U.S. at 248).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.] . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

favor." *Liberty Lobby*, 477 U.S. at 255.  To defeat a summary judgment motion, however, the

nonmoving party must offer more than "a scintilla of evidence" in support of its position.  *Id.* at

252.  Rather, "there must be evidence on which the jury could reasonably find for the plaintiff."

*Id.*  "In essence, . . . the inquiry [is] . . . whether the evidence presents a sufficient disagreement

to require submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law."  *Id.* at 251–52.

### III.  DISCUSSION

FLSA "ordinarily requires employers to pay employees time-and-one-half for hours

worked beyond the forty per week unless the employees are exempt."  *Robinson-Smith v. Gov't*

*Emps. Ins. Co.*, 590 F.3d 886, 888 (D.C. Cir. 2010); *see also* 29 U.S.C. §§ 207, 213.  As relevant

here, an employer is not required to pay overtime to exempt "bona fide . . . administrative"

employees.   29 U.S.C. § 213(a).  If an employer fails to pay a covered employee overtime, the

employee may bring a civil suit for her unpaid overtime wages, as well as an additional equal

amount as liquidated damages.  29 U.S.C. § 216(b).  If, however, "the employer shows to the

satisfaction of the [C]ourt that the act or omission giving rise to such action was in good faith

and that he had reasonable grounds for believing that his act or omission" did not violate FLSA,

the Court may, "in its sound discretion, award no liquidated damages" or reduce the liquidated

damages.  *Id.* § 260.

The District of Columbia's overtime laws parallel FLSA.  Like FLSA, DCMWA requires

time-and-one-half overtime but exempts administrative employees.  *See* D.C. Code. § 32-

1003(c); *see also id.* § 32-1004(a)(1) (expressly incorporating Secretary of Labor's definition of

the administrative-employee exemption).  At the time that Gainor filed suit, an employer who

violated DCMWA's overtime provisions was liable for the "unpaid wages, and an additional

amount as liquidated damages." D.C. Code § 32-1012(a) (2013). Like FLSA, DCMWA provided that the Court could reduce or decline to award liquidated damages if "the employer shows to the satisfaction of the [C]ourt that the act or omission that gave rise to the action was in good faith and that the employer had reasonable grounds for the belief that the act or omission was not a violation." *Id.* DCMWA's provisions on civil actions have since been amended, but the changes are immaterial to the present motion, and the parties agree that the FLSA standards also apply to Gainor's DCMWA claim. *See* Dkt. 11 at 15–16 n.6; Dkt. 14 at 3 n.2; *see also Galloway v. Chugach Gov't Servs., Inc.* 2016 WL 4179847, at *2 (D.D.C. Aug. 5, 2016); *Powell v. Am. Red Cross*, 518 F. Supp. 2d 24, 37 n. 13 (D.D.C. 2007).[5] The Court, accordingly, treats Gainor's FLSA and DCMWA claims together, and, for simplicity's sake, the Court refers only to FLSA in the remainder of this opinion.

As explained below, the Court concludes that genuine issues of material fact preclude granting summary judgment on both the Optical Society's "administrative-employee" exemption

---

[5] DCWMA now provides for liability "in the amount of the unpaid wages, statutory penalties, and an additional amount as liquidated damages equal to treble the amount of unpaid wages," and provides that the Court may

> award an amount of liquidated damages less than treble the amount of unpaid wages, but not less than the amount of unpaid wages . . . [if] the employer shall demonstrate to the satisfaction of the [C]ourt that: (A) [t]he act or omission that gave rise to the action was in good faith; (B) . . . the employer had reasonable grounds for the belief that the act or omission was not in violation of this subchapter; and (C) . . . the employer promptly paid the full amount of wages claimed to be owed to the employee.

D.C. Code § 32-1012(b) (2016).

defense to the merits of Gainor's claim and its good-faith defense to Gainor's claim for

liquidated damages.[6]

## A.      Administrative-employee Exemption

"It is well-settled that 'exemptions from [FLSA] are narrowly construed against the

employer in order to further Congress's goal of affording broad federal government

protection[,]" *McKinney v. United Stor-All Ctrs. LLC*, 656 F. Supp. 2d 114, 121 (D.D.C. 2009),

---

[6] As a threshold matter, the Court rejects the Optical Society's contention that the Court should treat its statement of undisputed facts as conceded because Gainor failed to comply with the requirements of Local Rule 7(h). See Dkt. 17 at 5–10. As the Optical Society correctly observes, Local Rule 7(h) provides that "[a]n opposition to [a motion for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." The rule further provides, moreover, that "the Court *may* assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." DDC LR 7(h) (emphasis added); *see also Moncrief v. Daro Realty, Inc.*, 2005 WL 1119794, at *1 (D.D.C. April 28, 2005). Federal Rule of Civil Procedure 56(e), similarly, provides that, "[i]f a party . . . fails to properly address another party's assertion of fact . . . , the court *may* . . . consider the fact undisputed for purposes of the motion." (Emphasis added). Here, rather than comply with the relevant rules and file a statement *disputing* the Optical Society's statement of undisputed material facts supported by specific record citations, Gainor simply filed her own statement of *undisputed* material facts. That procedural deficiency has added to the work of both the defendant and the Court. Although a close question, the Court will not, however, accept the Optical Society's invitation to treat its statement of undisputed material facts as conceded for two reasons: First, the potentially dispositive assertions contained in the Optical Society's statement of material fact are better viewed as conclusions of law—or mixed statements of law and fact—than as concrete assertions of fact. The Optical Society asserts, for example, that "Gainor exercised discretion and independent judgment in planning, implementing, and managing [certain] projects." Dkt. 11 at 33 (Defendant's SUMF ¶ 19). To understand the legal implications of this assertion, as the Court is required to do, *see Grimes v. District of Columbia*, 794 F.3d 83, 95–99 (D.C. Cir. 2015) (Griffith, J., concurring), the Court must in any event examine the underlying factual record. Second, Gainor has supplied the Court with her own statement of undisputed material facts, which, although less helpful than the document required by the rules, has identified the factual material that Gainor apparently contends demonstrates that the Optical Society is not entitled to summary judgment. Under these unique circumstances, the Court concludes that treating the Optical Society's statement of undisputed material facts as conceded is unwarranted.

and that "the burden is on the employer to demonstrate [that] the employee is in fact exempt," *id.* at 120 (quoting *Am. Fed'n of Gov't Emps., AFL–CIO v. Office of Pers. Mgmt.*, 821 F.2d 761, 771 (D.C. Cir. 1987)).  As relevant here, FSLA provides that its overtime wage requirements do not apply to "any employee employed in a bona fide executive, administrative, or professional capacity, . . . as such terms are defined and delimited from time to time by regulations of the Secretary."  29 U.S.C. § 213(a)(1).  The Secretary of Labor, in turn, has promulgated detailed regulations outlining criteria for the application of the administrative-employee exemption.  *See* 29 C.F.R. §§ 541.200 *et seq*.  These regulations "are entitled to judicial deference and are the primary source of guidance for determining the scope of exemptions to the FLSA."  *McKinney*, 656 F. Supp. 2d at 121 (internal quotation marks omitted) (first alteration in original).

Under the governing regulations, "[a]n employee falls under the administrative exemption if [(1)] her compensation is high enough . . . , [(2)] her 'primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers,' and [(3)] her 'primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.'"  *Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 163 (D.C. Cir. 2015) (quoting 29 C.F.R. § 541.200(a)).  "Whether a particular duty is administrative presents a legal question, whereas the amount of time devoted to administrative duties, and the significance of those duties, are questions of fact."  *McKinney*, 656 F. Supp. 2d at 122.  "When the underlying facts are in dispute, [t]he . . . question" whether the administrative exemption is available "under the FLSA is a mixed question of law and fact," and the weighing of disputed evidence "is the function of the jury."  *Radtke*, 795 F.3d at 165 (internal quotation marks omitted).

10

1.      *Criterion One: Rate of Compensation*

There is no dispute that the first criterion set forth in the Department of Labor regulations is satisfied.  In particular, this criterion is met if the employee is paid "not less than $455 week." 29 C.F.R. § 541.200(a)(1).  Here, Gainor was paid more than twice that amount; she was initially paid $1,250 a week and was later paid about $1,270 a week.  Dkt. 11 at 31 (Def's SUMF ¶ 11); Dkt. 14-2 at 1 (Pl's SUMF ¶ 2).  Accordingly, the first criterion supports the Optical Society's defense.

2.      *Criterion Two: Primary Duty*

The second criterion for application of the exemption for administrative employees requires that the employer show that the employee's "primary duty [was] the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers."  29 C.F.R. § 541.200(a)(2).  Under the governing regulations, "[t]he term 'primary duty' means the principal, main, major or most important duty that the employee performs," as determined "based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  *Id.* § 541.700(a).  Factors relevant to the determination of an employee's primary duty "include, but are not limited to"

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id*.  Although "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee[,] . . . [t]ime alone . . . is not the sole test."  *Id.* § 541.700(b).

11

The Department of Labor regulations further provide that for the employee's primary duty to be "directly related to the management or general business operations of the employer or the employer's customers, . . . an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." *Id.* § 541.201(a).  Examples of such exempt work include "work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; [and] legal and regulatory compliance." *Id.* § 541.201(b).

The parties dispute whether Gainor's "primary duty" was "directly related to the management or general business operations of the employer." 29 C.F.R. § 541.201(a). According to the Optical Society, Gainor's primary duty involved the "functional areas" identified in the Department of Labor regulations as examples of work directly related to management and general business operations.  It contends, for example, that Gainor worked on "budgeting, procurement, purchasing, research, marketing, public relations, and personnel management." Dkt. 11 at 21.  According to Gainor, however, she merely provided logistical support and "executed the meeting plans designed by [her superiors at the Optical Society], and did not have autonomy with regard to significant decisions, such as meeting locations, topics, or speakers." Dkt. 14 at 2.

The Optical Society first argues that the meetings and events that Gainor worked on "directly related to [its] business operations because they played a crucial role in generating revenue" for it. Dkt. 11 at 20.  In support of this argument, it points out that in 2012 revenue

from meetings accounted for nearly 30% of the organization's revenue.  *Id.*  But Gainor was responsible for, at most, only a small subset of the Optical Society's meetings, *see* Dkt 14-4 at 28 (Gainor Dep. 106–07); *see also* Dkt. 11-4 at 2 (stating that Optical Society holds over "30 meetings . . . each year"); Dkt. 11 at 31 (Def.'s SUMF ¶ 12) (stating Gainor worked in some capacity on eleven events during her tenure); Dkt. 14-2 at 2 (Pl.'s SUMF ¶ 8) (stating Gainor worked in some capacity on eight events during her tenure), and the record is unclear as to the importance of Gainor's particular projects and duties.  Indeed, the Optical Society's analysis of her position states that the impact of a mistake by a meetings manager would have only "[m]oderate consequences for the association; perhaps significant consequences to the [meetings] department."  Dkt. 11-12 at 4.  Thus, although the Department of Labor regulations provide that an employee who "leads a team of other employees assigned to complete major projects for the employer" is one example of an exempt administrative employee—"even if the employee does not have direct supervisory responsibility over the other" team members, 29 C.F.R. § 541.203(c)—the Court cannot, on the present record, conclude that Gainor led the kind of major projects contemplated by the regulations, *see id.* (listing "negotiating a real estate transaction or a collective bargaining agreement, or designing and implementing productivity improvements" as examples of "major projects").

In addition, the Optical Society has not established the absence of a genuine dispute of material fact as to whether Gainor's work on meetings and events involved the "management or general business operations" of the Optical Society, as distinct from the mere production of its meetings and events.  29 C.F.R. § 541.201(a).  The fact that Gainor "recommend[ed] that [the Optical Society] could save money by making coffee in-house in large urns rather than paying a caterer to supply coffee for meetings and events," Dkt. 11 at 35 (Def.'s SUMF ¶ 28), does show

that her work, on at least one occasion, touched on the management or operations of the Optical

Society.  But that one incident does not establish, as a matter of law, that her primary duty was

"directly related to the management or general business operations" of the organization.  To the

contrary, Gainor was told that she could further develop her suggestion for saving money on the

coffee service only if doing so "didn't interfere with her productivity on other things," Dkt. 14-5

at 33 (Jackman Dep. 125)—that is, her "productivity" on other matters had to come first.  Nor

does the Optical Society's reliance on a performance evaluation, stating that Gainor "was

assigned to oversee" an audiovisual request for proposal "that was a high impact/important

project to the entire department," suffice to show that it is entitled to prevail as a matter of law.

*See* Dkt. 11 at 32 (Def.'s SUMF ¶ 18); Dkt. 11-14 at 5.  Beyond this conclusory statement, the

record includes no explanation of the substance of this assignment or why it was "important" to

"the entire department."

It appears from the present record, moreover, that Gainor played no role in determining

what events the Optical Society should hold, who would be invited to such events, or what

substantive matters would be on the agenda at these events.  *See*, *e.g.*, Dkt. 14-4 at 32 (Gainor

Dep. 125); Dkt. 14-5 at 14, 25, 27–28 (Jackman Dep. 50, 94, 101–108); Dkt. 14-6 at 21 (Stark

Dep. 79).  Nor did she decide which events she would work on or what events other employees

would staff.  Dkt. 14-4 at 37 (Gainor Dep. 145); Dkt. 14-5 at 4–5, 10, 12 (Jackman Dep. 12–13,

34–36, 42).  Although there is evidence that Gainor provided some input regarding the

generation of revenue from the meeting and events on which she worked, *see* Dkt. 11-24 at 2

(email from Gainor to Jackman providing "a cost comparison of the original budget vs. a $40

registration increase"); Dkt. 11-25 at 2 (email from Gainor to Stark "showing the difference"

with a registration fee increase of $20 and asking Stark when he will tell her "the decision on the

registration rate"); Dkt. 14-5 at 28–29 (Jackman Dep. 107–108) ("[R]egistration fees for our conferences are established and approved by our board of directors."), that input was apparently minimal.  The same is true, moreover, with respect to Gainor's input into the creation of budgets, *see* Dkt. 14-5 at 7, 33–34 (Jackman Dep. 21, 126–29); Dkt. 14-6 at 5–7 (Stark Dep. 13–18, 24), which, at least as far as the present record shows, was also limited.[7]  Although she had some input into the creation of budgets for congresses and incubator meetings to which she was assigned—she did not have input into the budgets for leadership and governance events.  *See* Dkt. 11-28 at 2; Dkt. 14-4 at 33–34 (Gainor Dep. 128–30); Dkt. 14-6 at 13–14 (Stark Dep 47–49).  Her budget recommendations as to the former, moreover, were always subject to approval by more senior employees.

The record also reveals a genuine dispute of material fact regarding whether—and to what extent—Gainor's work involved the "functional areas" of procurement, purchasing, research, marketing, public relations, and personnel management.  29 C.F.R. § 541.201(b). Although meeting managers were expected to have "a solid understanding of contract negotiation [and] vendor and service agreement negotiation[s]," Dkt. 14-5 at 11 (Jackman Dep. 37–38), the record, once again, includes only limited evidence of Gainor's authority in the areas of procurement and purchasing.  Although she had authority to sign for all expenses incurred on-site—that is, to sign receipts acknowledging that services had been rendered satisfactorily—the Optical Society does not dispute that she could not sign contracts or service agreements with

---

[7]  Although a summary of the meeting manager position included in the record discusses the solicitation of corporate contributions and research into federal grant funding for Optical Society events, *see* Dkt. 11-44 at 2–3, the Optical Society offers no argument or evidence that Gainor was ever actually charged with such fundraising responsibilities.  *See generally* Dkt. 11; Dkt. 11-1.

vendors for any of the meetings she managed.  *See* Dkt. 14-5 at 17–19 (Jackman Dep. 62–70);

Dkt. 17-1 at 25 (Def.'s Reply SUMF).[8]  It further concedes that to the extent that Gainor worked

on service agreements, she used templates provided to her by vendors or the Optical Society's

legal department.  *See* Dkt. 17-1 at 25 (Def.'s Reply SUMF); *see also* Dkt. 14-5 at 30 (Jackman

Dep. 115–116); Dkt. 14-5 at 33–34 (Jackman Dep. 126–29); Dkt. 14-6 at 5–6, 9 (Stark Dep. 13–

18, 31–32).  Nor is the Court persuaded by the existing evidence regarding Gainor's work

researching event locations and vendors that her primary duty necessarily involved the functional

area of "research" within the meaning of the Department of Labor regulations.  *See* 29 C.F.R.

§ 541.201(b).

Similarly, the record is not "one-sided" with respect to the "functional areas" of

"marketing" or "personnel management."  *Liberty Lobby*, 477 U.S. at 251–52; 29 C.F.R.

§ 541.201(b).  The Optical Society is correct that Gainor's duties included working with event

leaders and the Optical Society's marketing department to determine what graphics to use in

event materials, overseeing the posting of information about events to the Optical Society's

website, and sending some communications to event participants.  Dkt. 11-46 at 2; Dkt. 11-48 at

2; Dkt. 14-4 at 38 (Gainor Dep. 149); Dkt. 14-5 at 7 (Jackman Dep. 22–23).  But Jackman

testified that Gainor could not make decisions that "deviat[ed]" from or "impact[ed] the

graphical representation and branding" of events "set by [the separate] marketing" department.

Dkt. 14-5 at 26 (Jackman Dep. 99).

---

[8]  Stark testified that Gainor had authority to sign orders "agreeing to the services that were
requested by the meeting manager" but also that Gainor lacked authority "to sign contracts with
vendors." Dkt. 14-6 at 9 (Stark Dep. 30–32).  It is unclear how those statements are reconcilable,
but, in any event, at least for purposes of summary judgment, the Optical Society concedes that it
Gainor could not sign-off on service agreements.  *See* Dkt. 17-1 at 25.

As for the "function[]" of "personnel management," 29 C.F.R. § 541.201(b), Jackman testified that no other employees directly reported to Gainor and that Gainor had no authority to hire or fire anyone, Dkt. 14-5 at 12 (Jackman Dep. 42).  And although Gainor on at least some occasions provided feedback on meeting planners' and meeting coordinators' performance to their supervisors, *see* Dkt. 11-49 at 2; Dkt. 14-4 at 35 (Gainor Dep. 135–37), that uncontested fact is insufficient to establish, as a matter of law, that her primary duty pertained to "personnel management," *cf.* 29 C.F.R. § 541.203(e) (providing that a human resources manager is exempt where she "formulate[s], interpret[s], or implement[s] employment policies").  Indeed, the existing record suggests that it was Gainor's supervisor, Jackman, who was responsible for most of the functional areas that the Optical Society attributes to Gainor, at least with respect to the operations of the meetings department.  *See* Dkt. 14-5 at 3–4 (Jackman Dep. 8–9) (Jackman's testimony that she was "responsible for personnel management for the logistics team within [the Meetings Department,] . . . oversight of budgets, . . . managing expenses, [as well as] . . . review[ing] contracts, . . . legal agreements, and . . . all financial documents and processes within the department").

Finally, the Optical Society contends that Gainor's primary duty was analogous to those of a municipal parks department's events coordinator and camps coordinator—positions that a 2006 Department of Labor opinion letter found would satisfy the second criterion for application of the administrative-employee exemption.  *See* Dkt. 11 at 18 (citing *Opinion Letter Fair Labor Standards Act (FLSA)*, 2006 WL 3227789 (Sept. 21, 2006) ("DOL Op.")).  But "a job title alone is insufficient to establish the exempt status of an employee," Daniel B. Abrahams, et al., FLSA Emp. Exemption Hdbk. ¶ 457, 2004 WL 5032713, and, at least on the present record, the positions considered in the Department of Labor opinion letter are readily distinguishable.

In the 2006 opinion letter, the Department of Labor considered the exempt status of a parks department's events coordinator who was responsible for six festivals hosted by the city, including recommending and implementing the themes, soliciting donations for the festivals, negotiating and entering into contracts on behalf of the department, designing advertising and marketing programs, and hiring and supervising employees for the festivals. *See* DOL Op., 2006 WL 3227789, at *1.  The same opinion letter also considered the status of a camps coordinator who was responsible for planning and coordinating the city's summer day camps, including picking the courses to offer, hiring and firing employees, deciding on locations and dates for the camps, planning budgets and compensation, and hiring and training camp staff.  *Id.*  In concluding that the two positions fell within the administrative-employee exemption, the Department of Labor emphasized that the coordinators were involved in all phases of the events, from conceptualization to implementation.  *Id.* at *3.  It further stressed that the coordinators had authority to bind the city on significant matters "with little or no supervision."  *Id.*  In this case, in contrast, the undisputed facts do not establish that Gainor was entrusted with this type of responsibility for Optical Society events.  Rather, it appears that she merely served as a logistical coordinator for events conceived of by others, with no authority to bind the Optical Society either financially or in the other functional areas identified in the Department of Labor regulations.

For the foregoing reasons, the Court concludes that genuine issues of material fact remain as to whether Gainor's primary duty was directly related to the Optical Society's—or the meeting department's—management or general business operations.  *See Radtke*, 795 F.3d at 165.  For this reason alone, the Optical Society is not entitled to summary judgment on the merits of Gainor's claim.

3.      *Criterion Three: Discretion and Independent Judgment on Significant Matters*

The Optical Society's motion for summary judgment fails for a second reason as well. To prevail on its defense that Gainor was an exempt administrative employee, the Optical Society must also establish, based on undisputed facts, that her "primary duty include[d] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3).  The governing regulations provide that, "[i]n general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id.* § 541.202(a).  "The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources," *id.* § 541.202(e), but, at the same time, it "does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review," *id.* § 541.202(c).  The regulations provide the following non-exhaustive list of factors relevant to whether the employee exercises discretion and independent judgment with respect to matters of significance:

> [1] whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; [2] whether the employee carries out major assignments in conducting the operations of the business; [3] whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; [4] whether the employee has authority to commit the employer in matters that have significant financial impact; [5] whether the employee has authority to waive or deviate from established policies and procedures without prior approval; [6] whether the employee has authority to negotiate and bind the company on significant matters; [7] whether the employee provides consultation or expert advice to management; [8] whether the employee is involved in planning long- or short-term business objectives; [9] whether the employee investigates and resolves matters of significance on behalf of management; [10] and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.* § 541.202(b).

The Optical Society does not contend that Gainor had authority to commit it in matters with "significant financial impact" (factor four); that she had authority to "deviate from established policies or procedures without prior approval" (factor five); that she could "negotiate and bind the company on significant matters" (factor six); or that she "represent[ed] the company in handling" or "resolving" complaints or disputes (factor ten).  It does contend, however, that the remaining factors support entry of summary judgment in its favor.  *See* Dkt. 11 at 23–24. But even assuming for present purposes that summary judgment might in some circumstances be warranted based on only a subset of the governing factors, genuine issues of material fact abound as to whether even those factors cited by the Optical Society favor its position.

There is little evidence that Gainor was given "authority to formulate, affect, interpret, or implement management policies or operating practices."  29 C.F.R. § 541.202(b) (factor one); *supra* pp. 12–15.  To be sure, as discussed above, she did suggest that the meetings department make coffee in-house, Dkt. 14-5 at 32–33 (Jackson Dep. 124–25), but that was a single example of policy input and, even then, she was only allowed to work on implementing her proposal to the extent doing so did not detract from her other (presumably, principal) duties.  In other respects, moreover, the record is far from conclusive—or undisputed—with respect to whether Gainor had the authority to formulate or affect policy, as opposed merely to implementing policy decisions made by others.

Similarly, the parties dispute whether Gainor's worked on "major assignments" or matters affecting the organization's operations "to a substantial degree."  29 C.F.R. § 541.202(b) (factors two and three).  Although there is little doubt that sponsoring events is central to the work of the Optical Society, the existing record does not definitively resolve whether each of the

events as to which Gainor played a substantial role were particularly important ones and, more significantly, whether Gainor's role, which involved logistics as opposed to substance, was critical to the success of those events.  And although the record demonstrates that Gainor investigated various venues and vendors for the Optical Society, it is disputed whether those tasks constituted "matters of significance" to the Optical Society or, more significantly, that Gainor had authority to "resolv[e]" significant matters.  29 C.F.R. § 541.202(b) (factor nine); *supra* pp. 15–16.

It is true that Gainor "provided consultation to [Optical Society management]" to at least some degree.  *See* Dkt. 11 at 23 (citing factor seven).  It is undisputed, for example, that she provided more senior employees with recommendations regarding the logistics of certain Optical Society events.  *See, e.g.*, Dkt. 14-2 at 5 (Pl.'s SUMF ¶ 36).  These recommendations, moreover, at least arguably involved the "planning [of] long and short-term business objectives" of the Optical Society.  *See* Dkt. 11 at 23 (citing factor eight).  And the Optical Society is also correct that an employer can meet its burden under the third Department of Labor criterion without showing that the employee had "unlimited authority [with] a complete absence of review" and that the making of "recommendations for action rather than the actual taking of action" may suffice.  29 C.F.R. § 541.202(c).  But the Optical Society is mistaken in arguing that the relevant question is "whether the employee's duties include *any amount* of discretion."  Dkt. 11 at 22 (emphasis in original).  In support of this contention, the Optical Society relies on the D.C. Circuit's decision in *Robinson-Smith v. Gov't Emps. Ins. Co.*, 590 F.3d 886 (D.C. Cir. 2010).  There, applying a prior version of the Department of Labor regulations,[9] the Court of Appeals

---

[9]  Unlike the current regulations, the pre-2004 version of the regulations contained two, alternative tests.  Under the "long test," the employer was required to show that the employee "customarily and regularly exercise[d] discretion," while, under the "short test," the employer

held that the exemption did not require that the employee "frequently" exercise discretion. *Id.* at 894.  But, the Court still recognized that discretion requires some level of "freedom from immediate direction," *id.*, and that the exemption requires that the employee be free to exercise that discretion "'with respect to matters of significance,'" *id.* at 895 (quoting 29 C.F.R. § 541.207(a)).

Applying that test here, the Optical Society cannot prevail at summary judgment merely by showing that Gainor made some recommendations to senior management and exercised some day-to-day discretion regarding matters of minor significance.  Making virtually any recommendation does, of course, involve some discretion and judgment; indeed, it is unclear what it would mean to make a recommendation without exercising any independent judgment.  Similarly, virtually every employee exercises some discretion regarding some tasks in the course of their workdays.  The critical question, however, is whether the employee exercised discretion or independent judgment regarding "matters of significance."  29 C.F.R. § 541.202(a).  And, here, the answer to that question is subject to genuine dispute.  Gainor points to evidence, for example, which when viewed in the light most favorable to Gainor, as the Court is required to do at this stage of the proceeding, suggests that she was typically required to base her work on templates, to use vendors that the Optical Society had previously used, and to obtain approval for even minor matters.  *See, e.g.*, Dkt. 14-2 at 3–7 (Pl.'s SUMF ¶¶ 19, 20, 27, 37–38, 40, 43, 45, 48, 52).

---

was only required to show that the employee's work "include[d] work requiring the exercise of discretion and independent judgment."  29 C.F.R. § 541.2 (2003 version); *see also Robinson-Smith*, 590 F.3d at 892 (discussing the 2003 version of the regulation and the two tests).  When the Department of Labor amended the regulations, it indicated that the new regulations were "consistent with the . . . short test," 69 Fed. Reg., 22,122, 22,139 (Apr. 23, 2004), and the relevant language still asks whether the employee's primary duty "includes" the exercise of discretion and independent judgment.

Finally, the Optical Society correctly notes that what matters is whether Gainor's job responsibilities involved significant matters admitting of the exercise of discretion and independent judgment—and not whether Gainor "chose . . . to exercise this discretion." Dkt. 11 at 26. It argues, moreover, that it found fault in Gainor's performance precisely because she "often refused or failed to exercise discretion and independent judgment." Dkt. 11 at 33 (Def.'s SUMF ¶ 21). The Court agrees that an employee hired to perform duties falling within the exemption is not entitled to overtime compensation merely because he fails to exercise the discretion and judgment required by the job; if the chief executive officer of a company became overwhelmed by the responsibility of his position and was unable to make any decisions, he would not thereby qualify for overtime compensation. But the evidence regarding whether this is such a case is subject to reasonable dispute. Gainor testified that she did not receive a position description when she started work, Dkt. 14-4 at 20 (Gainor Dep. 74–76), and, although there is evidence that she was shown one when she interviewed, that document does not irrefutably establish the actual responsibilities that Gainor was assigned. Rather, what matters most is what was asked of Gainor by her supervisors over the course of her employment, and, as discussed above, the evidence on that question is not "so one-sided that reasonable men and women could not . . . reach[ ] a verdict in [Gainor's] favor." *Radtke*, 795 F.3d at 165 (quoting *Muldrow v. Re-Direct, Inc.*, 493 F.3d 160, 165 (D.C. Cir. 2007)).

The Court, accordingly, concludes that genuine issues of fact remain as to whether Gainor's "primary duty include[d] the exercise of discretion and independent judgment with respect to matters of significance," 29 C.F.R. § 541.200(a)(3), and thus, for this reason—as well as the Optimal Society's inability to establish the applicability of the second criterion as a matter

of law, *see supra* at p. 18—the Optical Society is not entitled to summary judgment on the merits of its exempt-employee defense.

**B.      Liquidated Damages**

Under FLSA, the Court has discretion to disallow or reduce liquidated damages "if the employer shows to the satisfaction of the [C]ourt that the act or omission giving rise to such action was in good faith and that [the employer] had reasonable grounds for believing that [its] act or omission was not a violation of [FLSA]."  29 U.S.C. § 260; *see also* D.C. Code § 32-1012 (2013 & 2016) (parallel DCMWA provision).  The Optical Society contends that, "[e]ven if the Court finds a triable issue of material fact regarding whether Gainor was properly classified as exempt," the Court should enter "partial summary judgment [in favor of the Optical Society] on Gainor's claim for liquidated damages because no triable issue of fact exists regarding whether [it] had a good faith and reasonable belief that it properly classified Gainor."  Dkt. 11 at 26.

The Court disagrees for two reasons.  First, the Optical Society's request for relief is premature because "[a] court cannot evaluate the 'reasonableness' of an employer's belief that its 'act or omission was not a violation' without first identifying the 'act or omission.'"  *Thomas v. Howard Univ. Hosp.*, 39 F.3d 370, 373 (D.C. Cir. 1994).  "Then, and only then, is the court in a position to ascertain what the employer believed about its acts or omissions, and to evaluate the employer's reasons for so believing."  *Id.*  Unlike in the case cited by the Optical Society, there remain questions of material fact surrounding the "act or omission" giving rise to this action.  *Cf. Thompson v. Linda And. A., Inc.*, 779 F. Supp. 2d 139, 153–54 (D.D.C. 2011) (declining to grant summary judgment where the employer "failed to show that [it] had reasonable grounds for believing that [its] wage policy was not a violation" of FLSA).  The Court cannot assess the

reasonableness of the Optical Society's asserted belief that it properly classified Gainor as exempt without a more complete record as to the nature of her job duties in the relevant context.

Second, the Optical Society has not adduced the kind of evidence necessary for it to prevail as a matter of law on the question of liquidated damages.  As the Optical Society acknowledges, "[t]he good faith defense to liquidated damages requires 'an affirmative showing of a genuine attempt to ascertain what the law requires,' not simply the absence of bad faith."  *Id.* at 153 (quoting *Danesh v. Rite Aid Corp.*, 39 F. Supp. 2d 7, 13 (D.D.C. 1999); *see also* Dkt. 11 at 26.  The good-faith defense, moreover, requires both "a subjective inquiry" into the employer's beliefs and application of "an objective standard."  *Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 464 (D.C. Cir. 1976), *overruled in part on other grounds, McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 134 (1988); *see also* 29 U.S.C. § 260.  Here, however, the Optical Society has failed to identify any evidence regarding "what [it] believe[d] about [the relevant] acts or omissions" or its "reasons for . . . believing" that those acts or omissions were lawful.  *Thomas*, 39 F.3d at 373. Rather, it merely reargues the merits of whether Gainor was an exempt administrative employee and states that the conclusion that she was exempt "is reinforced by" the 2006 Department of Labor opinion letter discussed above.  *See* Dkt. 11 at 26–27; *see also supra* pp. 17–18.  That evidence says nothing about the Optical Society's subjective state of mind and, for the reasons explained above, fails to show that it was "objectively" reasonable for it to have failed to pay Gainor overtime wages.

Although "ambiguous or complex legal requirements may provide reasonable grounds for an employer's good faith but erroneous belief that he is in conformity with the Act[,] . . . legal uncertainty, to assist the employer's defense, must pervade and markedly influence the employer's belief; merely that the law is uncertain does not suffice."  *Laffey*, 567 F.2d at 466.

Here, the Optical Society has offered no evidence that it in fact relied on the 2006 Department of Labor opinion letter to make its determination that Gainor was exempt and, even if it had adduced such evidence, the Court could not determine on the present disputed record whether such reliance would have been reasonable.  *Cf. Thomas*, 39 F.3d at 373 ("In most instances an employer will be able to satisfy § 260's 'reasonable grounds' requirement only if it has relied on a reasonable, albeit erroneous, interpretation of [FLSA] or of the regulations issued thereunder.").  The Court, accordingly, denies the Optical Society's motion for summary judgment with respect to liquidated damages.

## CONCLUSION

For the foregoing reasons, the Optical Society's motion for summary judgment, Dkt. 11, is **DENIED.**  The parties shall appear for a status conference on October 5, 2016, at 10:00 a.m. in Courtroom 21.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 7, 2016